No. 2412

Second Circuit

THE CITIZENS BANK v. G. W. HUDSON;
F. O. HUDSON, Intervenor

(December 1, 1925, Opinion and Decree)

*(Syllabus by the Editor)*

1. **Louisiana Digest—Fraudulent Convey-
ances—Par. 1, 7, 34, 61.**
A pretended sale in fraud of creditor where
no price is agreed upon and there is
no delivery of the property is a simu-
lation and, therefore, invalid.

Appeal from Fifth Judicial District Court
of Louisiana, Parish of Richland. Hon.
John R. McIntosh, Judge.

Tobin R. Hodge, of Rayville, attorney
for plaintiff, appellee.

G. W. Smith, of Rayville, attorney for
defendant and intervenor, appellees.

REYNOLDS, J. Plaintiff brought an at-
tachment suit against G. W. Hudson and
caused certain teams, harness, etc., to be
seized.

F. C. Hudson intervened, claiming own-
ership of the property seized. He alleged
that the property formerly belonged to a
partnership composed of himself and G. W.
Hudson and that prior to the seizure he
had bought G. W. Hudson's interest.

Plaintiff answered the intervention, set-
ting up that the property was that of its
debtor and that the intervenor's pretended
purchase was a simulation or, if not, then
it was fraudulent and should be annulled.

The district judge gave plaintiff judg-
ment against defendant for the amount of
the debt sued for, sustained the attachment
and dismissed the intervention.

The intervenor appealed.

Defendant did not appeal, but filed in
this court a motion to amend the judg-
ment as between the plaintiff and himself.

The law is well settled that no amend-
ment can be made as between appellees.

Judgment affirmed.

OPINION

The question to be decided is whether
the property seized belonged to Hudson
Brothers, G. W. Hudson or F. O. Hudson.

F. O. Hudson testified that in 1923 he
bought G. W. Hudson's interest in the
partnership. This precludes any conten-
tion that the property belonged to the
partnership and hence not subject to seizure
for G. W. Hudson's debts, and narrows
the question down to whether the property
belonged to G. W. Hudson or F. O. Hudson;
whether F. O. Hudson's alleged purchase
of G. W. Hudson's interest in the prop-
erty was real or simulated. And this is
the issue fairly presented by the pleadings
and the evidence.

The evidence relative to this question
is that of F. O. Hudson, who testified,
page 9:

"Q. Why did you let Mr. G. W. Hudson
remain or why did you give him posses-
sion and let him bring this stuff here
and use it?
"A. I had nothing for it to do and
nothing to operate it with, told him at any
time he could satisfy the debt of the
Bank of Commerce and Trust Company I
was willing to turn the whole thing over
to him, I was tired fooling with it, didn't
care for it; all I wanted to do was to settle
what the partnership owed the Bank of
Commerce and Trust Company.'
"Q. Mr. Hudson, you have testified that
this partnership, composed of yourself and
G. W. Hudson, was an ordinary partner-
ship; I will ask you if you know what an
ordinary partnership is?
"A. No, I couldn't say that I do; it was
just formed when we borrowed this money
from the Bank of Commerce; we bor-
rowed it in Hudson Brothers' name; he
acquired a half interest in the amount of
stuff on hand and in charge of it, has been
ever since.

\* \* \* \*
(Page 10)

"Q. Who was Hudson Company?
"A. Hudson Company is a corporation owned by W. M. Hudson and operated by him solely.
"Q. And W. M. Hudson is a brother of yours?
"A. Yes.

\* \* \* \*
(Page 11)

"Q. Does he own all of the stock?
"A. No, sir.
"Q. Do you own any of it?
"A. Own one share.

\* \* \* \*

"Q. Now, when this stuff left DeSoto parish I believe you said it went to Haynesville?
"A. Yes.
"Q. In possession of whom?
"A. Hudson Brothers when it left DeSoto parish.
"Q. I know; which one of the Hudsons carried it there? G. W. Hudson?
"A. G. W. Hudson, yes.
"Q. You didn't go along did you?
"A. I didn't go the day it went there, no, sir.
"Q. And then it moved from Haynesville to Arkansas, I believe you said?
"A. Part of it, yes.
"Q. Who carried it there?
"A. He did.
"Q. G. W. Hudson?
"A. Yes.
"Q. Then he moved it from Arkansas to what point?
"A. Crew Lake.
"Q. Crew Lake; he was still in possession of it?
"A. Yes.

(Page 12)

"Q. He used it as his own?
"A. He did.
"Q. He fed it and worked it?
"A. Yes.
"Q. And collected for the earnings?
"A. Yes.

\* \* \* \*
(Page 15)

"Q. And you paid him a thousand dollars in cash for his half interest in that twenty-four or five head?

"A. No, sir; no, sir—yes, yes, for half interest in possibly forty head or more.
"Q. And gave him two hundred and fifty dollars to bring them from Arkansas to Richland parish?
"A. I did.
"Q. And assumed an indebtedness of around four thousand dollars?
"A. Possibly that much, I don't remember.
"Q. In payment of that?
"A. Yes; and ——
"Q. Now, wait a minute; now didn't you also testify just a few moments ago on direct examination that you left all this property with your brother for the reason that you had nothing for it to do?
"A. I did.

\* \* \* \*
(Page 16)

"Q. And did you not have time to look after it?
"A. Yes.
"Q. And didn't have time to look after it or have anything for it to do up to and including the day you sued out this injunction, did you; in other words, you never have had anything for it to do since you bought it up until you brought this suit?
"A. No, sir.

\* \* \* \*

"Q. What is your brother, G. W. Hudson, doing now?
"A. He is working in the Webster parish oil field, I think.
"Q. Same business he has been engaged in all the while, hauling?
"A. I really don't know what he is doing, Mr. Hodge. Just be honest about it. I don't know what he is doing, what he has been doing since the time of this seizure.
"Q. Where is this stock now?
"A. I got part of it on the farm and there is part of it over there.

\* \* \* \*
(Page 17)

"Q. Your brother, G. W. Hudson, has got part of it and you have got part of it?
"A. Yes.

\* \* \* \*
(Page 20)

"Q. Now, then, Mr. Hudson, what is your explanation for giving to your brother fifty-two hundred and fifty dollars for a

half interest in a partnership whose assets you have already stated were not worth as a whole in excess of five thousand dollars?

"A. The two hundred and fifty dollars, Mr. Hodge, was given to him for expense money to bring it back to Louisiana, after I had bought his interest.

"Q. Yes?

"A. And another reason is he was advised by Mr. Jerome Queenan to sell it in the presence of Mr. Harwell.

"Q. And you took his advice?

"A. I did after due consideration.

\*   \*   \*   \*

"Q. And gave him a thousand dollars in cash, too?

"A. Yes, I did that.

"Q. Well, doesn't that make five thousand dollars that you paid for his half interest?

"A. No, sir, I can't see it that way.

"Q. What does it make you paid?

"A. Only makes twenty-five hundred dollars I paid for half interest. ·

"Q. All right; you already owned half of that four thousand dollars, didn't you?

"A. Yes.

"Q. You assumed the half interest of the two, was it?

"A. Yes.

"Q. You gave him three thousand dollars in cash, didn't you? Didn't that make three thousand dollars you paid him for his half of it? One instead of three?

"A. No, sir, I can't see it that way.

"Q. Then how do you arrive at the twenty-five hundred dollars that you ——

"A. We valued it at twenty-five hundred dollars and I gave him a thousand dollars in money.

"Q. Yes?

"A. Which would have left me, had we not owed this money to the bank, owing him fifteen hundred dollars, instead of paying to him why I assumed what · he owed the bank, was it?

"Q. Well, you assumed two thousand dollars he owed at the bank?

"A. If it was four thousand dollars, I did; why I don't know exactly what the amount was at that time.

"Q. Well, what is your explanation of the reason that you paid this price for the stuff?

"A. The reason that I paid it, Mr. Hodge, was because I thought it was worth it just like I go in a barn and buy a mule; if I

·can agree with the man to sell the mule on the price why I paid it because I think it was or is worth it.

"Q. You thought it was worth it, yet you had no use for it and nothing for it to do?

"A. Not at that time, I did not have anything for it to do.

"Q. And haven't had since?

"A. No, sir.

"Q. And haven't had any use for it since you bonded it out under this injunction?

"A. No, sir, I haven't.   I am using some of it.

"Q. And your brother, G. W. Hudson, is still able to find something for it to do and he is using it for you, isn't that so?

"A. If he is using it he is using it for himself and not for me.

"Q. Using it for himself?

"A. Yes, not for me.

\*   \*   \*   \*

(Page 23)

"Q. Are there any judgments in Shreveport against Hudson Brothers?

"A. No, sir.   Well, there is this Bank of Commerce and Trust Company judgment.

"Q. They have got a judgment against you?

"A. Against Hudson Brothers, yes.

\*   \*   \*·   \*

(Page 24)

"Q. You don't know how many or where they were?

"A. Yes, they were in Arkansas and he brought them to Richland parish at the time he brought the partnership stuff.

·   (Page 25)

"Q. He also owed something on his stock, didn't he?

"A. I don't know; he bought the bulk of his stock after he went to Haynesville. I don't know how it was, what he bought it with.

"Q. Have you actually participated in the management of this partnership about which you have testified since it was organized?

"A. Oh, yes, yes.

\*   \*   \*   \*

"Q. When did you quit?

"A. When he carried it to Haynesville.

"Q. When he went to Haynesville you didn't have any more to do with it?

"A. No, sir.

*  *  *  *
(Page 51)

"Q. Mr. Hudson, where were you when you bought the interest of your brother in this partnership about which you have testified?

"A. Homer.

"Q. At Homer?

"A. Yes.

"Q. Who was present when this transaction took place?

"A. Mr. Queenan and Mr. Harwell.

"Q. Mr. Harwell?

"A. Yes.

"Q. Were any one else?

"A. And G. W. Hudson.

*  *  *  *
(Page 52)

"Q. You say Mr. Harwell was present when you bought your brother's interest in that partnership property?

"A. He was talking; when we was talking it out in the middle of the street between the courthouse and the clerk's office or out on the courtyard and on the way to the clerk's office where the transaction was completed.

"Q. Did Mr. Harwell see you give your brother this check?

"A. No, sir, he did not.

"Q. When did your brother give this thousand-dollar check to your other brother?

"A. I don't know, sir.

"Q. Is your other brother, G. W. Hudson, present?

"A. Yes."

W. L. Harwell testified, page 52:

"Q. Mr. Harwell, you have just heard F. O. Hudson state that you were present in Homer when he made a trade with his brother for an undivided half interest in the property belonging to a partnership that he says existed between himself and G. W. Hudson, is that so?

"A. Well, I can't say for sure about that; I don't really know about that deal; I don't—they was saying something about something; some way I mean about a few, I didn't understand that deal, I don't know about it; I can't say about that part of it, I didn't really hear the deal made for sure; they might have said a little something or other about it, something I couldn't say just sure, they—what they did say in

there, I didn't hear the full deal made nothing like that at all.

"Q. So if G. W. Hudson sold F. O. Hudson any interest that he had in anything you didn't hear it?

"A. No, sir, I didn't know about that.

*  *  *  *
(Page 53)

"Q. Well, now isn't it a fact that you understood that something of that kind was being done that G. W. Hudson was selling to F. O. Hudson?

"A. I don't know enough about it to give any light on it, to be truthful about it. I didn't have anything to do with that part of it. I don't know anything really about that part of it.

(Page 33)

"Q. How do you know whether or not G. W. Hudson bought any harness or mules or horses while he was engaged there at Haynesville?

"A. Yes, he did.

"Q. About how many did he buy?

"A. Well, it would be pretty hard for me to say exactly how many he did buy.

"Q. Were they—would you say as many as ten or fifteen?

"A. Well, yes, I would think so.

(Page 37)

"Q. Do you know who carried that stock from Haynesville to Arkansas?

"A. Yes.

"Q. Who?

"A. Mr. G. W. there.

(Page 40))

"Q. Give us some idea of what you mean by a good many?

"A. Seventy-five or eighty head. No, let me see, he was working at one time, I expect, it was very near that many there he started out with about, when I started working for him, I think he had about six or seven four-ups, something like that; when he left, carried these away from there to Smackover, he must have had seventeen or eighteen four-ups, something like that.

(Page 41)

"Q. How many did he have left in Haynesville?

"A. He had this twenty-six head there I bought.

"Q. After you bought the twenty-six head, how many did he have left at Haynesville?

"A. He didn't have any left at Haynesville.

(Page 42)

"Q. How many did he have when you went to work for him?

"A. When I went to working for him he must have had twenty-five or thirty head when I went to work for him; he brought some more along; he bought a few along at the time; sorter hard to keep up with it; tell exactly how many he did have."

H. C. Cummings testified, page 45:

"Q. Did you know G. W. Hudson?

"A. Yes.

"Q. How long have you known him?

"A. Since he came to Haynesville.

"Q. When did he go to Haynesville?

"A. In nineteen hundred and twenty-one.

"Q. What business was he engaged in there?

"A. Teaming business.

"Q. Was this judgment that you got against him for feed?

"A. Yes.

"Q. To whom did you sell the feed to? To G. W. Hudson?

"A. G. W. Hudson.

"Q. Did you ever hear of Hudson Brothers?

"A. No, sir. I have heard of Hudson brothers, but no Hudson brothers together in the teaming business I ever heard of; Hudson Brothers in Shreveport.

"Q. Was that Hudson Brothers composed of G. W. Hudson and F. O. Hudson?

"A. Yes.

"Q. Did G. W. Hudson hold himself out to you and to other people in Haynesville as the owner of this stock?

"A. Yes.

(Page 45)

"Q. Do you know how many head of horses and mules Mr. G. W. Hudson was working there in nineteen hundred and twenty-one and up until the time that the outfit was divided, part going to Arkansas and part remaining at Haynesville?

"A. He had about seven four-ups when he first came there.

"Q. Seven four-ups would be how many head?

"A. Be about thirty head, somewhere about thirty head; later on he got in possession of about sixty or seventy head, something like that."

Loy L. Been testified, page 48:

"Q. Were you living in Haynesville in nineteen hundred and twenty-one, twenty-two, twenty-three and twenty-four?

"A. Yes.

"Q. What business were you engaged in?

"A. General mercantile business, that is, twenty-one; we sold out in twenty-two.

"Q. Twenty-two, did you know Mr. G. W. Hudson?

"A. Yes.

"Q. I ask you to state whether or not during that time you sold Mr. Hudson any stock?

"A. I sold him two saddle horses.

"Q. Did you sell him any harness?

"A. Yes, I sold him some harness.

(Page 49)

"Q. Now you know whether or not he was buying or selling stock pretty well all the while, while he was there, trading?

"A. He was buying some and swapping some.

"Q. Doing considerable trading?

"A. Yes, got some out of Shreveport, some from dealers there in Haynesville."

G. W. Hudson, a brother of plaintiff, with whom he claims to have made the trade and who is now claiming this stock was present in the courtroom and, though called as a witness for cross-examination by the seizing creditor, was not permitted to testify as on cross-examination and was never sworn as a witness for the plaintiff.

The above quoted evidence shows that G. W. Hudson moved to Haynesville in 1921 and had at that time seven four-ups teams twenty-eight or thirty head of stock. He operated these teams as his own for about two years, bought, sold and swapped mules and horses frequently and increased his teams from six or seven four-ups or twenty-four or twenty-eight head, to seventeen or eighteen four-ups or sixty-eight or seventy-two head.

He then divided his teams and sent all but twenty-six head to Smackover, Arkansas. Sixteen of the twenty-six head were encumbered with a chattel mortgage in favor of a bank at Mansfield, Louisiana, and were, therefore, sixteen of the twenty-four head of stock that he moved from Mansfield to Haynesville and probably constituted the outfit that G. W. Hudson moved from Haynesville.

In some way not explained in the evidence those teams were in the hands of the Citizens Bank of Haynesville and by a compromise agreement between the bank, G. W. Hudson and F. O. Hudson, they were sold to Harwell and $1200 of the purchase price was paid to F. O. Hudson. Roughly, this is about one-half of the value of the outfit that G. W. Hudson moved to Haynesville from Mansfield, and if F. O. Hudson owned a one-half interest in same his interest was well cared for in the compromise agreement made between the bank and G. W. Hudson and F. O. Hudson.

It is also shown that the thousand-dollar check handed to G. W. Hudson was promptly endorsed to W. M. Hudson, another brother.

Sixteen of the mules that were in the possession of the Citizens Bank of Haynesville were covered by a chattel mortgage in favor of the Bank of Commerce and Trust Company of Mansfield, and F. O. Hudson testified that he and his brother, G. W. Hudson, owed the bank $4,000.00, and that he had since borrowed from the bank $750.00. It is therefore not unreasonable to suppose, that this thousand dollars eventually went to the bank in Mansfield on the payment of it and the fact that F. O. Hudson owed this mortgage to the bank of something like $4,000.00 and borrowed since that time $750.00 is additional reason for questioning the bona fides of the purchase of the property claimed by him—property for which he admits he had no use and had no time to attend to.

The teaming outfit that had been sent to Smackover, Arkansas, and later moved to Crew Lake and seized in this case, was entirely under the management and control of G. W. Hudson, and F. O. Hudson's contention that he bought an interest in them from G. W. Hudson must stand or fall under the foregoing quoted evidence.

From this evidence it is apparent that F. O. Hudson at the time he pretended to purchase his brother's half interest in this stock in the town of Homer, Louisiana, did not pretend to know at what price he was purchasing same, nor was there any delivery of the property, for the stock were at that time in Arkansas. There was, therefore, insofar as the seizing creditor in this case is concerned, two of the essential elements of a sale lacking, to-wit: A price and delivery, and under all of the evidence we are convinced that the pretended sale was a simulation. Under all of the evidence we are convinced that the property moved to Arkansas was insofar as the seizing creditor is concerned the property of G. W. Hudson.

For these reasons the judgment of the lower court is correct and it is accordingly affirmed.